Victor KARACAND, et al., On Behalf
of Themselves and All Others
Similarly Situated, Plaintiffs,

v.

Kim B. EDWARDS, Leonard C. Purkis,
and Iomega Corporation,
Defendants.

No. 1:98 CV 18 K.

United States District Court,
D. Utah,
Northern Division.

June 11, 1999.

Scott A. Call, Thomas R Karrenberg, Anderson & Karrenberg, Salt Lake City, UT, Blake M. Harper, Michael L. Schrag, Spencer A. Burkholz, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, Jeffrey W. Golan, Mark R. Rosen, Barrack Rodos & Bacine, Philadelphia, PA, Christine M. Comas, Jonathan K. Levine, Adrienne L. Valencia, Kaplan Kilsheimer & Fox, New York City, Mel E. Lifshitz, Bernstein Liebhard & Lifshitz, New York City, for Victor Karacand, Paul Winston, Lorry Wagner.

Scott A. Call, Thomas R. Karrenberg, Anderson & Karrenberg, Salt Lake City, UT, Daniel E. Bacine, Barrack Rodos & Bacine, Philadelphia, PA, for David Darby, Aaron Lotz, plaintiffs.

Scott A. Call, Thomas R Karrenberg, Anderson & Karrenberg, Salt Lake City, UT, for Yaakov Prager, Joshua Chopp, Victor Karter, Phil Smolowitz, Alan Allio, Calvin H. Huber, plaintiffs.

Scott A. Call, Thomas R Karrenberg, Anderson & Karrenberg, Salt Lake City, UT, Andrew L. Barroway, Schiffrin Craig & Barroway, Bala Cynwyd, PA, for Joseph Fortuna, plaintiff.

Scott A. Call, Thomas R Karrenberg, Anderson & Karrenberg, Salt Lake City, UT, Marvin L. Frank, Rabin & Peckel LLP, New York City, for Jay Kaible, plaintiff.

Scott A. Call, Thomas R Karrenberg, Anderson & Karrenberg, Salt Lake City, UT, Blake M. Harper, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, Ellen Gusikoff Stewart, Diane P. Doherty, Spector & Roseman PC, San Diego, CA, Martin D. Chitwood, Christi C. Mobley, Chitwood & Harley, Atlanta, GA, for Dennis L. Simons, Michele L. Simons, William L. Glosser, plaintiffs.

David W. Scofield, Parsons Davies Kinghorn & Peters, Salt Lake City, UT, for Barton Kessler, plaintiff.

Scott A. Call, Thomas R Karrenberg, Anderson & Karrenberg, Salt Lake City, UT, Joseph C. Kohn, Denis F. Sheils, Kohn Swift & Graf PC, Philadelphia, PA, Brian M. Felgoise, Law Offices of Brian M. Felgoise, Abington, PA, for John V. Abbamondi, plaintiff.

Joel R. Dangerfield, Salt lake City, UT, Harvey Greenfield, New York City, for Billy R. Thedford, plaintiff.

Thomas R Karrenberg, Anderson & Karrenberg, Salt Lake City, UT, Blake M. Harper, William S. Lerach, Spencer A. Burkholz, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, Daniel E. Bacine, Barrack Rodos & Bacine, Philadelphia, PA, Christine M. Comas, Jonathan K. Levine, Adrienne L. Valencia, Kaplan Kilsheimer & Fox, New York City, Morris J. Levy, Stephen G. Levy, Levy & Levy, Great Neck, NY, for Rodney D. Veitschegger, Sr., plaintiff.

James W. Prendergast, Jeffrey B. Rudman, Michael G. Bongiorno, Christine A. Maglione, Hale & Dorr, Boston, MA, Stephen G. Crockett, Wesley D. Felix, Giauque Crockett Bendinger & Peterson, Salt Lake City, UT, for Kim B. Edwards, Leonard C. Purkis, Iomega, defendants.

## ORDER

KIMBALL, District Judge.

Before the Court are Defendants' Motion to Dismiss the Consolidated Class Action Complaint (the "Complaint") and Plaintiffs' Motion to Strike Maglione Declaration as to Stock Holdings and Exhibits 1, 2, 4, & 6 of Declaration of Maglione in Support of Motion to Dismiss. Resolution of the motions requires this Court to: (i) discern the relevant standards of review and legal rules, (ii) determine which materials in addition to the Complaint, if any, are to be considered, and (iii) apply the standards and rules to those materials. After a brief introduction, each matter is addressed in turn.

## BACKGROUND

The plaintiffs in this class action lawsuit purchased the common stock of Utah-based computer storage device maker Iomega Corporation ("Iomega" or the "Company") between September 22, 1997, and January 2, 1998 (the "Class Period"). The plaintiffs allege that the defendants, Iomega and two of its former officers, Kim Edwards and Leonard Purkis, made false and misleading statements in violation of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act" or "1934 Act") and that Edwards and Purkis engaged in insider trading in violation of § 20(a) of the Exchange Act. More particularly, the plaintiffs allege that Edwards and Purkis conspired to inflate artificially the price of Iomega stock during the Class Period in order to reduce profitably their own Iomega stock holdings and that they did so by overstating the demand for Iomega products, by misrepresenting the probable release date for an important new Iomega product, by misrepresenting the status of component quality and supply problems, and by concealing the fact that Iomega planned to engage in an expensive advertising campaign.

## STANDARDS OF REVIEW

Defendants move to dismiss pursuant to Rules 9(b) and 12(b)(6) of the *Federal Rules of Civil Procedure,* and the provisions of the Private Securities Litigation Reform Act of 1995, *Pub.L. No. 104–67, 109 Stat. 737 (1995)* (the "Reform Act").

### A. Rule 12(b)(6).

The purpose of a Rule 12(b)(6) motion is to test whether the facts alleged entitle the plaintiff to some form of legal remedy. For this purpose, the court generally confines itself to the text of the complaint and accepts all pleaded facts as true. *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1251 (10th Cir.1997). The court does not accept, however, allegations concerning the legal effect of the events the plaintiffs have set out if these allegations do not reasonably follow from the description of what happened, are contradicted by the description itself, or are contradicted by facts that have been judicially noticed. *See 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure* § 1357 (2d ed.1990).

### B. Rule 9(b).

"The purpose of Rule 9(b) is to prevent the filing of a complaint as a pretext for the discovery of unknown wrongs." *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 752 (N.D.Cal.1997). Toward this end, Rule 9(b) imposes particularized pleading requirements on plaintiffs alleging fraud or any claim premised on fraud. The rule provides: "In all averments of fraud or mistake, the circumstances constituting fraud shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." As interpreted, the rule requires a plaintiff to identify the time, place, and content of each allegedly fraudulent representation or omission, to identify the particular defendant responsible for it, and to identify the consequences thereof. *Schwartz,* 124 F.3d at 1252–53.

■ In the securities context, a plaintiff must also allege facts showing that an alleged misstatement is false. "Fed. R.Civ.P. 9(b) requires that to state a claim for securities fraud, '[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false'. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir.1997) *(quoting In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994) *and citing 15 U.S.C. § 78u–4(b))*.

### C. The Reform Act.

Congress passed the Reform Act in December 1995 in an effort to heighten Rule 9(b)'s pleading standards, concluding that the previously existing pleading standards "ha[d] not prevented abuse of the securities laws by private litigants.[1] The Reform Act imposes even more rigorous pleading requirements on plaintiffs alleging fraud in the securities context. A complaint under the Reform Act must "specify each statement alleged to have been misleading" as well as "the reason or reasons why the statement is misleading." *15 U.S.C. § 78u–4(b)(1)*. In addition, the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" and must do so with respect to each act or omission alleged to be a violation of the securities laws. *15 U.S.C. § 78u–4(b)(2)*. Furthermore, for allegations made on information and belief, the complaint "shall state with particularity *all facts* on which that belief is formed." *15 U.S.C. § 78u–4(b)(1) (emphasis supplied)*. The Reform Act mandates dismissal, upon motion of the defendant, if the complaint fails to meet these requirements. *15 U.S.C. § 78u–4(b)(3)(A)*.

### ELEMENTS OF CLAIMS ALLEGED

### A. Section 10(b)—False and Misleading Statements.

■ Plaintiffs allege violations of Section 10(b) of the Exchange Act, *15 U.S.C. § 78j(b)*, and Rule 10b–5 thereunder, *17 C.F.R. § 240.10b–5*. To state a claim under Rule 10b–5, a plaintiff must allege: (1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with scienter; (4) reliance; and (5) damages. *See Novell*, 120 F.3d at 1118. In their motion to dismiss, Defendants question whether Plaintiffs have adequately alleged that Defendants made a misleading statement or omission of material fact and whether any such statement or omission was made with requisite scienter.

### 1. Materiality.

■ "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock." *Novell*, 120 F.3d at 1119. Whether a misstatement or omission is material is determined by a two-step inquiry. A court must first determine whether the information would be considered important by a reasonable investor; if so, the court must then determine whether the information would still be considered important in light of other information already available to the market.

Courts have identified several types of statements that, by their nature, are not considered important. Such statements include those classified as "corporate optimism" or "mere puffing." They "are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification." *Id. (rejecting securities claims based on statements, inter alia, that company had experienced "substantial success," was "moving rapidly" towards integration,*

---

1. *Statement of Managers—Reform Act, H.R.Rep. No. 104–369, at 41, 1995* U.S.C.C.A.N. 730 (1995) (hereinafter "Conf. Rpt.").

*and that new applications would "quickly reshape" customer expectations).*

Courts also recognize that an otherwise material forward-looking statement may be rendered immaterial "when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect," that is, when "other documents available to the investing public 'bespoke caution' about the subject matter of the alleged misstatement at issue." *Novell,* 120 F.3d at 1119–20; *see also In re Stac Elec. Sec. Litig.,* 89 F.3d 1399, 1409 (9th Cir.1996) *(statement must be misleading "in light of all the information then available to the market").* This so-called "bespeaks caution" doctrine is to be applied in considering a motion to dismiss. *Novell,* 120 F.3d at 1120. The doctrine's essence is that if a company warns investors in a meaningful way of the risks facing its business, investors cannot claim that they were misled.

In enacting the Reform Act, Congress created a statutory version of the bespeaks caution doctrine, the Safe Harbor. Motivating the codification, Congress found that the existing system of private securities litigation had a "muzzling effect" on "the willingness of corporate managers to disclose information to the marketplace" because companies and their officers were subjected to potentially limitless liability if they disclosed projections that later turned out to be inaccurate. *Conf. Rpt. at 42–43.*

The Safe Harbor provides that a defendant shall not be liable for a forward-looking statement if it "is identified as a forward-looking statement and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *15 U.S.C. § 78u–5(c)(1)(A).* As defined in the statute, a "forward-looking statement" is a projection of financial items, a description of management's plans and objectives for future operations or economic performance, or the stated assumptions underlying these projections. *15 U.S.C. § 78u–5(i)(1).* The Safe Harbor does not apply to the extent a statement was made by a person or entity having actual knowledge that it was false or misleading. *15 U.S.C. § 78u–5(c)(1)(B).*

"Cautionary statements" are considered "meaningful" if they "convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business." *Conf. Rpt. at 43.* However, the "[f]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor." *Id. at 44.*

Courts must determine, at the pleading state, whether a company's forward-looking statements fall within the Safe Harbor. *15 U.S.C. § 78u–5(e).*

### 2. Omissions and the Duty to Disclose.

Under Rule 10b–5, when defendants voluntarily disclose information, they have a duty only to make the disclosure at the time "complete and accurate." *Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996) *(quoting Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir. 1987)).* The "duty to disclose additional material facts [exists] only to the extent that the volunteered disclosure was misleading as to a material fact." *In re Craftmatic Sec. Litig.,* 890 F.2d 628, 641 n. 17 (3d Cir.1989) *(citing Basic v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).* "Materiality alone is not sufficient to place a company under a duty of disclosure." *In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 400 (6th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998) *(citing Basic,* 485 U.S. at 239 n. 17, 108 S.Ct. 978).*

▮ Thus, to comply with this duty, the defendants must have stated only what was "needed so that what was revealed would not be so incomplete as to mislead." *Summa Four*, 93 F.3d at 992 *(internal quotation marks and citation omitted)*. This obligation, however, carries with it no duty to make projections about the future. Nor, as made express by the Reform Act, does it impose a duty to update forward-looking statements. *See Exchange Act § 21E(d), 15 U.S.C. § 78u–5(d)*.

### 3. Scienter.

▮ Section 10(b) does not reach unintentional conduct; the scienter element requires plaintiffs to prove the defendants' intent to defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Prior to the enactment of the Reform Act, plaintiffs were permitted to aver scienter generally. However, as previously mentioned, the Reform Act now requires plaintiffs "to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each act or omission alleged. *15 U.S.C. § 78u–4(b)(2)*.

▮ Applying the requirements of *Hochfelder* and the Reform Act together, courts have held that "in order to state a private securities fraud claim, plaintiffs must create a strong inference of knowing or intentional misconduct." *See Silicon Graphics*, 970 F.Supp. at 757. "Knowing or intentional misconduct includes deliberate recklessness as described in [*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir.1990) ] and alluded to in *Hochfelder*. Motive, opportunity, and non-deliberate recklessness may provide some evidence of intentional wrongdoing, but are not alone sufficient to support scienter unless the totality of the evidence creates a strong inference of fraud." *Id; see also In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1107–08 (D.Nev.1998).

### B. Section 20(a)—Control Person Liability.

▮ The plaintiffs allege that Edwards and Purkis have control person liability for Iomega's Section 10(b) violations pursuant to Section 20(a) of the Exchange Act, which provides that a person who "directly or indirectly" controls any person who commits a violation of the securities laws may be held jointly and severally liable with the primary violator. *15 U.S.C. § 78t(a)*. "[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir.1998). As defined in SEC regulations, control means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." *17 C.F.R. § 230.405*. Although "the control person determination is a factual question not ordinarily subject to resolution on a motion to dismiss, dismissal is appropriate when ... a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person." *Maher*, 144 F.3d at 1306.

### C. Section 20A—Insider Trading.

Plaintiffs allege further that Edwards and Purkis are liable for insider trading pursuant to Section 20A of the Exchange Act, which subjects defendants who purchase or sell securities while in the possession of material, nonpublic information to liability to any person who purchases or sells contemporaneously with an offending trade. *15 U.S.C. § 78t–1(a)*.

"Courts have interpreted § 20(A) as requiring the plaintiff to plead a predicate violation of the 1934 Act or its rules and regulations." *Sterlin v. Biomune Systems*, 154 F.3d 1191, 1194 n. 5 (10th Cir. 1998); *see also Jackson Nat. Life Ins. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d

Cir.1994). Although the Court of Appeals for the Tenth Circuit has not reached that issue, *see Sterlin*, 154 F.3d at 1194 n. 5, this Court need not consider the matter inasmuch as both sides agree that a Section 20A claim is dependent on a violation of the 1934 Act. *See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, p. 54; Defendants' Memorandum in Support of Their Motion to Dismiss the Consolidated Class Action Complaint, p. 43 (hereinafter, "Def.Mem.").*

### Scope of Review

Plaintiffs move the Court for an order striking several exhibits appended to Defendants' motion to dismiss, including various Iomega SEC filings, a transcript of a conference call with securities analysts that occurred on October 16, 1997 (the "Conference Call"), and various SEC filings of the individual defendants. Defendants submitted the documents to negate the materiality of certain alleged misstatements pursuant to the bespeaks caution doctrine and the Reform Act's Safe Harbor and to rebut the inference of scienter that Plaintiffs claim arises from the individual defendants' stock sales.

Plaintiffs argue that these documents may not be considered in connection with Defendants' motion because they are neither specifically referred to in the Complaint nor is their authenticity unquestioned.

### A. Documents to be Considered in Applying the Reform Act's Safe Harbor.

Congress directed courts to consider all information and documents relevant to determine whether a defendant gave a Safe Harbor warning, regardless of whether the information and documents are cited in the complaint. *Conf. Rpt. at 47.* The Safe Harbor provides that "the court shall consider ... any cautionary statement accompanying [a] forward-looking statement, which [is] not subject to

material dispute, cited by the defendant." *15 U.S.C. § 78u–5(e).*

With respect to oral forward-looking statements, the Safe Harbor explicitly provides that a written cautionary statement contained in an identified, "readily available document" may be incorporated by reference. *15 U.S.C. § 78u–5(c)(2)(B).* The Safe Harbor provides further that any document either "filed with the Commission or generally disseminated shall be deemed to be readily available" for this purpose. *15 U.S.C. § 78u–5(c)(3).*

The Safe Harbor does not address whether a written forward-looking statement may similarly incorporate by reference cautions contained in other documents. However, in applying the bespeaks caution doctrine, courts, including the Tenth Circuit, "have not required cautionary language to be in the same document as the alleged misstatement or omission." *Novell*, 120 F.3d at 1122. Because the Safe Harbor and the bespeaks caution doctrine are essentially co-extensive in the Tenth Circuit, whether an alleged misstatement was made orally or in writing does not bear on this Court's analysis.

In support of their motion to dismiss, Defendants have directed this Court to Safe Harbor warnings accompanying certain of the alleged misstatements at issue here. Those warnings refer to Iomega's 1996 Form 10–K, June 1996 prospectus, Form 10–Q Second Quarter 1997, and Form 10–Q Third Quarter 1997. *Def. Mem., pp. 22–24.* Plaintiffs do not question the authenticity of the copies of those documents attached to Defendants' motion. Accordingly, they are properly before the Court.

Defendants also direct the Court to cautionary statements made during the Conference Call. Plaintiffs do not question the authenticity of the transcription attached

to Defendants' motion.[2] Accordingly, the transcription is also properly before the Court.

### B. Documents to be Considered in Determining whether Plaintiffs have Plead Scienter.

■ Plaintiffs attempt to plead that the individual defendants acted with scienter by asserting that they intended to sell unusual amounts of Iomega stock, rather than retaining their shares. *Complaint,* ¶¶ *51–53.* The Complaint contains an extensive discussion of the individual defendants' alleged class period stock sales, which purports to be based on the investigation of Plaintiffs' counsel, including a review of "Iomega's SEC filings." *Complaint,* ¶ *84.*

Insiders of a public company such as Iomega must file a Form 3, 4, or 5 with the SEC showing the insider's purchases and sales of the company's stock. *15 U.S.C. § 78p(a); 17 C.F.R. §§ 240.16a–2, 16a–3.* Defendants submitted Form 3, 4, and 5 filings of the individual defendants with their motion to dismiss in order to negate Plaintiffs' showing of scienter by demonstrating that Edwards and Purkis retained a substantial portion of their stock holdings.

Plaintiffs contend that these documents may not be considered on the additional ground that they constitute hearsay. They argue that in those cases where judicial notice has been taken of SEC filings, notice has only been taken of the fact that the documents were filed or that misrepresentations were contained in them. For at least two reasons, Plaintiffs' arguments are unpersuasive.

First, Plaintiffs themselves have alleged the truth of the matters asserted in the documents by basing their allegations concerning the individual defendants' stock sales on information taken from them. *See Complaint,* ¶¶ *51–53.* Courts have rejected as disingenuous the attempts of plaintiffs to exclude documents on which they rely in pleading their allegations. In *Silicon Graphics,* the plaintiffs' complaint stated, as here, that their allegations were based on, among other things, a review of the company's SEC filings. When the plaintiffs then objected to the court's consideration of those filings in ruling on the defendants' motion to dismiss, the court considered the documents on the basis of the doctrine of incorporation by reference, despite the plaintiffs' omission of an express reference to them in their compliant. 790 F.Supp. at 759. The court rejected the plaintiffs' attempt to exclude the forms as hearsay for the same reasons. *Id.* *("Having raised questions about defendants' stock sales, based their allegations on defendants' SEC filings, and submitted expert declarations that rely on the SEC forms at issue, plaintiffs can hardly complain when defendants refer to the same information in their defense.").*

Second, the exhibits are offered not only for their truth, but also to demonstrate the state of mind of the individual defendants. As such, they are excepted from the hearsay rule by Rule 803(3) of the *Federal Rules of Evidence. See Silicon Graphics,* 970 F.Supp. at 759 n. 6 *("Alternatively, they may be admissible not to prove the truth of the information contained in them, but to show the lack of scienter on the part of the defendants.").*

Accordingly, the forms are properly before the Court.

### DISCUSSION

With the foregoing in mind, this Court now considers the individual misstate-

---

**2.** Plaintiffs were given a copy of an audio tape of the Conference Call shortly before oral argument of the motions at issue, but had not yet had the opportunity to compare the tape with the transcription. Plaintiffs reserved the right to bring any inaccuracies discovered in the transcription to this Court's attention, but, as of the writing of this opinion, have not done so. On that basis, this Court assumes that Plaintiffs do not challenge the transcription's authenticity.

ments or omissions alleged by Plaintiffs. Plaintiffs derived the alleged misstatements and omissions from a series of Iomega press releases and statements to the press. The first release was issued on September 22, 1997. In it, Iomega announced its expectation that one of its planned new computer storage products, "Jaz 2GB," would ship by the end of the fourth quarter of 1997 (the "9/22 Press Release"). Iomega reiterated its expectation that Jaz 2GB would ship by the end of the year in two more releases. The second was issued on October 16, 1997. In it, Iomega also reported its operating results for the third quarter (the "10/16 Press Release"). The Conference Call occurred on the same day and addressed the same matters. The third release was issued on November 14, 1997 (the "11/14 Press Release"). A fourth was issued on December 18, 1997 (the "12/18 Press Release"). In that release, Iomega announced that the planned shipment of Jaz 2GB would be delayed to the beginning of the first quarter of 1998 in order to conduct further quality testing.

Thereafter, on January 22, 1998, Iomega reported in a press release ("1/22 Press Release") and in a conference call with analysts its fourth quarter earnings. The Complaint's allegations arise from Iomega's simultaneous announcement that, despite record revenues and sales, its fourth quarter performance had been affected by a slowdown in demand in Asia, causing sales in that region to be below Iomega's internal plan, and that the postponed shipment of some of its new products into the first quarter of 1998 had contributed to a shortfall in revenue as compared with the Company's plan. *Complaint,* ¶ *42.* With this release of fourth quarter results, Iomega also announced its intent to begin a new $100 million advertising plan for 1998. Iomega's stock price fell 32% the next day. Plaintiffs filed the first class action lawsuit just two weeks later, followed by eleven others in the next several weeks, attributing the decline in Iomega's stock price to purportedly misleading

statements made during Defendants' prior announcements.

The alleged misstatements and omissions can be grouped in four categories and are considered accordingly.

**A. The "Jaz 2GB Availability Statements."**

▪ The Complaint challenges four statements by Defendants regarding the planned availability of Jaz 2GB:

1. In the 9/22 Press Release, Iomega stated that: "Jaz 2GB drives and 2GB disks are expected to be available ... in the fourth quarter of 1997 ...." *Complaint,* ¶ *32.*

2. During the Conference Call, "the Defendants represented that the Company was still on schedule to ship Jaz 2 in the fourth quarter of 1997." *Complaint,* ¶ *34.*

3. In the 11/14 Press Release, Defendants "represented that Jaz 2 would be available in the fourth quarter of 1997." *Complaint,* ¶ *39.*

4. In the 12/18 Press Release, Iomega announced that "Jaz 2 drives and disks would not be released until the first quarter of 1998" and that

> "[t]he decision not to ship Jaz 2GB this quarter is based on allowing Iomega to conduct further quality testing to assure that Jaz 2GB fully meets our rigorous quality standards before releasing the product for customer shipment." *Complaint,* ¶ *40.*

As reasons why these statements were purportedly misleading, the Complaint asserts: (a) that Defendants failed to acknowledge that beta testing conducted in July and August 1997 indicated that there was a compatibility problem between the Jaz 2 drive and Jaz 1 disks, *Complaint,* ¶¶ *33 and 37,* (b) that Iomega advised its employees in October and November via e-mail and during Customer Service department meetings not to tell customers that Jaz2GB would not ship in the fourth quar-

ter, *Complaint,* ¶ *33,* and (c) that the delay in the release of Jaz 2GB "was caused by" serious "compatibility problems," "would adversely affect sales of Jaz 1 drives and disks," and "would materially impact the Company's fourth quarter of 1997 results" *Complaint,* ¶¶ *38, 39, and 41.*

The statements are not actionable under either Rule 9(b) or § *78u–4(b)* because Plaintiffs have not alleged facts showing that anything about them was false at the time they were made. The beta testing occurred several months before the alleged misstatements were made. Plaintiffs, however, have not identified any contemporaneous statement or document indicating either that Jaz 2GB continued to suffer from such problems, that the problems could not be remedied by year end, that the problems had caused the delay, or that the delay would have any significant impact on fourth quarter performance. "[K]nowledge of problems does not make predicting an end to those problems fraud." *May v. Borick,* 1997 WL 314166, \*14 (C.D.Cal. Mar.3, 1997).

Moreover, Plaintiffs seek to draw—without any factual support—an unwarranted inference from the alleged messages and meetings, *i.e.,* that Jaz 2GB would, in fact, be delayed. However, if the internal understanding at Iomega was that the product would not be delayed, it was entirely consistent for Iomega and its management to tell employees not to report that the product would be delayed. Without any contemporaneous evidence demonstrating that, at the time of these alleged meetings

**3.** Importantly, on September 22, 1997, when Iomega announced the future availability of Jaz 2GB, it provided a Safe Harbor warning and cautioned investors about the possibility of developmental delays—and additionally advised investors to heed the warnings contained in its prior SEC filings regarding product development:

> Special note: Statements concerning the expected availability, features, included software and pricing of the Jaz 2GB drive and 2GB disks and the emergence of Jaz products as industry standards are forward-looking statements. There are a number of

and messages, Jaz 2GB would not ship by the end of the fourth quarter, Plaintiffs are simply asserting conclusory allegations that cannot be credited.

Even if Plaintiffs had alleged facts showing that the statements were false, relevant cautionary disclosures in Iomega's public SEC filings and press releases render the statements immaterial as a matter of law. As an initial matter, Defendants specifically warned investors of the possibility of delay:

> the Company is continuing to refine the product design for Jaz, and *there can be no assurance that the Company will not experience problems or delays* as it begins to manufacture and ship Jaz products in higher volume.

*Prospectus, 6/4/96, p. 6 (emphasis supplied).*[3] Similarly, and contrary to Plaintiffs' suggestion that Iomega did not advise the market that product delays could have an impact on its financial results (*see Complaint,* ¶ *38* ), Iomega, in fact, warned investors:

> [i]n addition to the risks surrounding existing products, the Company faces *development,* manufacturing, demand, and market acceptance risks with regard to recently introduced and future products, *including ... the Jaz 2GB drive* .... The Company's future operating results will depend in part on its success in introducing enhanced and new products in a timely and competitively effective manner.... *Any product availability ... problems experienced by the Company could have an adverse effect*

important factors that could cause actual events to differ materially from those indicated by such forward-looking statements, including market acceptance of, and demand for, the Company's Jaz drives and 1GB or 2GB Jaz cartridges, manufacturing, *development and distribution issues,* product pricing, competition, intellectual property rights and *other risks identified in Iomega's prospectus filed in June 1996,* its annual report for 1996 on Form 10K, and its most recent quarterly report on Form 10Q filed with the SEC.

*(See 9/22 Press Release) (emphasis supplied).*

*on the Company's sales and net income* . . . .

*10–Q Third Quarter 1997 (emphasis supplied).* These risk disclosures rendered any alleged representation regarding the future availability of Jaz 2GB immaterial as a matter of law.

### B. The "Backlog and Demand Statements."

■ The Complaint challenges five statements by Defendants regarding Iomega's backlog of orders and the demand for its products:

1. In the Conference Call, Defendants allegedly were "extremely bullish about the Company's outlook" for the fourth quarter of 1997. *Complaint, ¶ 34.*

2. In the Conference Call, Defendants allegedly represented that "the Company's backlog had grown to $379 million at the end of the third quarter." *Complaint, ¶ 34.*

3. In the Conference Call, Defendants allegedly represented that "the backlog was due to continued 'very strong' demand." *Complaint, ¶ 34.*

4. In the Conference Call, Defendants allegedly represented that "the Company was continuing at a high level of production of Zip and Jaz drives as it entered the fourth quarter." *Complaint, ¶ 34.*

5. In the Conference Call, Defendants allegedly represented that "Zip and Jaz disk sales would remain strong in the fourth quarter." *Complaint, ¶ 34.*

As reasons why these statements were purportedly misleading, the Complaint asserts that Defendants failed to acknowledge (a) that "demand was weakening and sales of disks were declining," (b) that "the domestic market was flat and [Iomega] had forecast no revenue growth in the fourth quarter for this market," and (c) that, "with respect to the Europe and Asia/Pacific markets, . . . sales in these markets were significantly below plan and that Iomega would not be able to meet its aggressive growth targets for the fourth

quarter for these markets." *Complaint, ¶ 37.*

■ With respect to the first item, alleging that a defendant conveyed a "bullish" attitude provides none of the details necessary to support a claim of fraud and fails to satisfy the specificity requirements of Rule 9(b) and the Reform Act. *See Rogal v. Costello,* 1992 WL 426467, *4 (N.D.Cal.1992) 6comment that speaker was "bullish" about financial period was "too vague and void of concrete information" to be actionable).* With respect to the second and third statements, the allegations fail to meet such requirements because the Complaint never alleges that any statement about the size or cause of the backlog was false.

■ The fourth and fifth statements are the type of vaguely worded statements of optimism that many courts find immaterial as a matter of law. *See In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1096 (N.D.Cal.1994)(dismissing statements that company expected "increased sales" and "very strong fiscal 1993"), aff'd,* 95 F.3d 922 (9th Cir.1996); *Schoenhaut v. American Sensors, Inc.,* 986 F.Supp. 785, 792 (S.D.N.Y.1997)(dismissing statements about "continued strong demand" as immaterial); In re Caere Corporate Sec. Litig.,* 837 F.Supp. at 1057 *(dismissing statements that company was "well positioned" for growth and had "continuing strong sales").*

■ Even if this Court were to assume that the fourth and fifth statements were material, they would still be insufficient to support a cause of action because Defendants had no duty to disclose the information that Plaintiffs allege rendered the statements misleading. In support of their claims of fraud with respect to the Backlog and Demand Statements, Plaintiffs allege that Defendants were aware of, but did not disclose, purported internal forecasts and expectations that domestic demand would decline and that hoped-for

results in the European and Asian markets would not be achieved. *Complaint, ¶ 37.* Defendants, however, had no duty to make these disclosures because Defendants made no specific projections or forecasts regarding fourth quarter results.

Comparably, in *Novell,* when addressing the plaintiffs' argument that the defendants' optimistic statement about future earnings required disclosure of the company's internal earnings forecasts, the Tenth Circuit concluded there had been no duty to disclose those forecasts because the challenged optimistic statement was not a "definite positive projection." 120 F.3d at 1125 *("[r]equiring premature quarterly earnings forecasts itself could give rise to potential claims of liability if the forecasts should turn out to be inaccurate").* Without a "definite positive projection," Defendants had no duty to project future results, and no duty to predict for the public what fourth quarter results would ultimately be.

Plaintiffs misquote Defendants when they claim the Defendants represented that sales "would remain strong." *Complaint, ¶ 34.* Defendants said nothing about future demand. Rather, Edwards, reporting *past* backlog figures, informed analysts only that "demand *remains* very strong." *Conference Call Transcript, p. 5 (emphasis supplied).* Otherwise, the Complaint does not identify a single public statement made by any defendant about the European or Asia/Pacific markets, nor does it identify a single hard forecast of expected sales results or specific growth

targets. In short, there was no specific statement rendered misleading by the purported omissions that Plaintiffs cite.

Rather, although describing the purported adverse information in the present tense, Plaintiffs, in essence, seek to fault Iomega for failing to predict publicly that it would, in the fourth quarter, suffer "weakening" product demand, that "ongoing compatibility problems" would delay the release of Jaz 2GB, and that it would not "meet its aggressive growth targets" for the European or Asia/Pacific markets. *Complaint, ¶ 37.* Artful phrasing of such predictive information, however, creates no duty of disclosure.

■■■ Even if Iomega's disclosure of its historic levels of backlog and product demand in the third quarter of 1997 suggested anything about Iomega's future performance or future demand for Iomega's products, during the Conference Call, when these statements were allegedly made, Iomega gave investors a Safe Harbor warning[4] and explicitly advised them not to rely on that backlog to predict future results. *(See Conference Call Transcript, p. 4 ("some of the $379 million backlog is due to customers placing orders that are higher than their actual needs"); p. 16 ("some of the backlog is overstated"); p. 23 ("you probably know some of the backlog is overstated .... you know that the backlog is not total[ly] real")).*[5]

Indeed, in its SEC filings, Iomega expressly warned investors against relying on past performance results:

4. Specifically, Edwards prefaced his statements during the Conference Call with the following:

> As we conduct the call, various remarks that we make about future expectations, plans and prospects constitute forward-looking statements for the purposes of the safe harbor provisions under the Private Securities Litigation Reform Act. As you know, actual results may differ materially from those indicated by these forward-looking statements as a result of various important factors including those identified in our 1996 annual report, form 10K, and our most recent 10Q.

*Conference Call Transcript, p. 1.*

5. Such warnings were also explicitly made in the Company's then most recent 10–K, as well as its June 4, 1996, prospectus:

> Moreover, it is common in the industry during periods of product shortage for customers to engage in practices such as double ordering in order to increase a customer's allowance of available product. *Accordingly, the Company's backlog as of any particular date should not be relied upon as an indication of the Company's sales for any future period.*

*10–K Fiscal Year 1996, p. 10; Prospectus, 6/4/96, p. 36 (emphasis supplied).*

The results of operations for the three- and nine-month periods ended September 28, 1997 are not necessarily indicative of the results to be expected for the entire year or for any future periods.

*10–Q Third Quarter 1997, p. 8.* Iomega was similarly cautious about future demand:

Future market *demand* for the Company's products *cannot be predicted with certainty.* Sales of Zip and Jaz products in 1996 and the first nine months of 1997 were the primary reasons for the Company's revenue growth in these periods. However, *these sales may not be indicative of the long-term demand* for such products. Accordingly, the *sales growth* experienced by the Company in 1996 and in the first nine months of 1997 *should not be assumed to be an indication of future sales.*

*10–Q Third Quarter 1997, p. 19 (emphasis supplied).*

Accordingly, the statements alleged in the Complaint regarding Iomega's Backlog and Demand Statements are insufficient to support Plaintiffs' claim.

## C. The "Component Problem Statements."

 The Complaint challenges four statements by Defendants, which Plaintiffs paraphrase, relating to their belief that certain component supply and quality problems that might affect future performance appeared resolved.

1. In the Conference Call, Defendants allegedly represented that "the Company had addressed [supply constraints and component quality problems experienced in the third quarter]." *Complaint, ¶ 34.*

2. In the Conference Call, Defendants allegedly represented that Iomega "had remedied all of the component quality problems." *Complaint, ¶ 34.*

3. In the Conference Call, Defendants allegedly represented that "there no longer were supply constraints to limit future demand." *Complaint, ¶ 34.*

4. In the Conference Call, Defendants allegedly represented that Iomega "was already shipping the ZipPlus product, [and] expected to ship the 15mm notebook Zip drive in November 1997." *Complaint, ¶ 34.*

As reasons why these statements were purportedly misleading, the Complaint asserts that Defendants failed to acknowledge that "there were still problems with ZipPlus and Zip notebook components that would continue to constrain sales of these products during the fourth quarter." *Complaint, ¶ 37.*

The Complaint fails to identify any contemporaneous report or specific internal information that existed at the time Iomega made its statement tending to show that the statement was false or that the statement was not reasonably believed. Accordingly, Plaintiffs fail to comply with the Reform Act's and Rule 9(b)'s pleading requirements.

 Although Plaintiffs attempt to cast them as purported misrepresentations concerning present fact, the plaintiffs' allegations regarding the Component Problem Statements also fail to state a claim because they are fundamentally statements regarding future expectations rendered immaterial by specific cautionary disclosures. As the court in *Harris v. IVAX Corp.,* 998 F.Supp. 1449, 1453 (S.D.Fla. 1997), concluded, Plaintiff's argument "is correct from a grammatical perspective only":

While the statement, "We believe that the challenges unique to this period are now behind us," technically reads as a statement of present condition, the meaning of such a statement is clear enough: despite the recent rough period, good times are ahead. Representations regarding the state of a business' position in a changing market or the soundness of its growth strategies are necessarily forward-looking.

*Id. (finding sufficient cautionary language immunized forward-looking statement from liability).*

Comparably, in this case, Plaintiffs allege that, during the Conference Call, Edwards misrepresented that Iomega "had remedied all of the component supply problems, and that there no longer were supply constraints to limit future demand." *Complaint,* ¶ *34.* In fact, Edwards stated only that "[w]e ... *believe* that we have fixed the known problems" and "we *think* we've solved them ...." *Conference Call Transcript, pp. 5, 9 (emphasis supplied).* Even so, he went on to warn that in the future:

> The issue, if we are going to face any in Q4, will be component availability at the moment as I suggested earlier.

*Id., p. 16 (emphasis supplied).* Investors also knew from warnings contained in Iomega's Form 10–Q filed with the SEC that:

> *any component problems, shortages,* quality issues or other factors affecting the supply of the Company's products, and any inability of the Company to add manufacturing capacity as needed *could limit the Company's sales ....*

*10–Q Third Quarter 1997, p. 18 (emphasis supplied).* Iomega, likewise, advised investors in its last Form 10–K filed with the SEC that:

> [m]any components incorporated in, or used in the manufacture of the Company's products are currently available only from single or sole source suppliers. The *Company has experienced difficulty in the past, and may experience difficulty in the future, in obtaining a sufficient supply of many key components* on a timely basis.

*10–K Fiscal Year 1996, p. 9 (emphasis supplied).*

Iomega specifically warned of potential future component availability issues, and Edwards' statements of his thoughts and beliefs—even as set forth by the Complaint—could not have been reasonably relied on as a representation that all issues were definitively and forever solved. Therefore, these statements cannot support Plaintiffs' claims of fraud.

### D. The "No Surprises Statement."

▇ Finally, the Complaint challenges a statement purportedly made by Defendants in the Conference Call that "the Company did not expect any surprises in the fourth quarter." *Complaint,* ¶¶ *34.* The Complaint alleges that the statement was misleading because Defendants failed to acknowledge the fact that Iomega had "committed millions of dollars in advertising expenses for the fourth quarter of 1997 and first quarter of 1998 in an expensive and risky advertising campaign directed to existing Iomega customers." *Complaint,* ¶ *38.*

In context, the statement related only to a caution against assuming that component problems would not recur—"[a]ll of these benefits together provide additional chip availability, but *unfortunately we could have another surprise,* we don't expect any in the quarter but at the moment chips don't seem to be a big issue." In any event, "surprises," by definition, are unexpected, and the statement is therefore meaningless and immaterial.

▇ The allegation also is inadequate because the Complaint fails to identify even a single prior statement regarding Iomega's advertising plans which the existence of a new advertising strategy would have rendered misleading. Accordingly, the allegations with respect to nondisclosure of Iomega's allegedly contemplated advertising campaign are not actionable.

### E. Scienter.

▇ Where, as here, plaintiffs have not adequately pleaded falsity, it is unnecessary to determine whether they have adequately pleaded scienter. Where plaintiffs fail to plead falsity, *a fortiori* they have not established that defendants knew those statements were false. *See San Leandro*

*Emergency Med. Group Profit Sharing Plan v. Philip Morris,* 75 F.3d 801, 813 (2d Cir.1996).

**F. Claims under Sections 20(a) and 20A.**

Plaintiffs' claims under Section 20(a) and Section 20A fail because they require a primary violation and, as set forth above, the Complaint fails to state such a claim.

### CONCLUSION

For the reasons set forth above, Plaintiffs' Motion to Strike Maglione Declaration as to Stock Holdings and Exhibits 1, 2, 4, & 6 of Declaration of Maglione in Support of Motion to Dismiss is HEREBY DENIED. Defendants' Motion to Dismiss the Consolidated Class Action Complaint is HEREBY GRANTED, and Plaintiffs' Complaint is dismissed with prejudice.[6]

**6.** Plaintiffs' motion for leave to amend is denied on the ground that amendment would be futile given the risk disclosures made by Defendants and given that the alleged false statements were generally nonmaterial as corporate optimism. *See Grossman,* 120 F.3d 1112

*(affirming trial court's denial of leave to amend on grounds, inter alia, that company's registration statements adequately disclosed potential risks of merger and that alleged false statements were generally nonmaterial as corporate optimism).*