Alan M. HARRIS and Yitzchok
Wolpin, Plaintiffs,

v.

IVAX CORPORATION, Phillip Frost and
Michael W. Fipps, Defendants.

No. 97–0559–CIV.

United States District Court,
S.D. Florida.

March 30, 1998.

Atlee W. Wampler, III, Ricardo A. Banciella, Wampler, Buchanan & Breen, Miami, FL, Jules Brody, Stull, Stull & Brody, Joseph H. Weiss, Weiss & Yourman, New York, NY, Leo W. Desmond, The Law Office of Leo W. Desmond, West Palm Beach, FL, Jeffrey G. Smith, Michael Jaffe, Wolf Haldenstein Adler Freeman & Hertz, New York,

**1450**

NY, Bernard Malina, Malina & Wolfson, Curtis V. Trinko, New York, NY, for Plaintiffs.

Eugene E. Stearns, Richard B. Jackson, Stearns Weaver et al., Miami, FL, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

MORENO, District Judge.

This is a securities fraud class action suit brought against IVAX corporation and two of its officers by a class of Plaintiffs who purchased IVAX common stock between August 2, 1996 and November 11, 1996. Plaintiffs allege that they were fraudulently induced to make these purchases by the materially false and misleading statements and omissions made by the Defendants. The issue before the Court is whether Defendants' statements fall within the safe harbor provision of the Private Securities Litigation Reform Act of 1995 ("Reform Act"). Because the Court finds that the Defendants' statements were forward-looking statements accompanied by meaningful cautionary language qualifying for the safe harbor's protection, the Court grants Defendants' motion to dismiss.

### Relevant Background

IVAX is pharmaceutical company headquartered in Miami, Florida. One of its primary lines of business is the manufacture of generic drugs, a business that has proved in recent years to be highly volatile. Although highly profitable in its early years, beginning in the second quarter of 1996, IVAX began to suffer a serious decline in earnings. IVAX reported a loss from operations that quarter of $13.9 million, or $0.11 a share, compared with net income of $28.1 million, or $0.24 per share a year earlier. The loss was attributed to reduced margins, lower prices, higher than anticipated levels of customer inventory credits, and the establishment of additional reserves for customer inventory returns.

In a press release issued August 2, 1996, the first day of the Class Period, Defendant Frost, the Chairman and Chief Executive Officer of IVAX stated:

Clearly, we have experienced a very disappointing quarter. We believe, however, that the challenges unique to this period in our history are now behind us. The broader challenges of the generic drug industry as a whole, and its tremendous opportunities, remain. We will meet these challenges with strategies honed and improved as a result of this most difficult quarter. More significantly, we will continue to exploit the industry's opportunities with a science team that has led the industry in U.S. generic drug approvals, and with a distribution network that is among the most extensive in the industry.

In evaluating our strategies, we have taken a hard look at our U.S. generic drug business. We have determined that, although we will not be blind to opportunities outside our organization to improve shareholder value, we must focus our resources on improving value from within. We have instituted actions to enhance the profitability of our U.S. generic business. We will also be expanding our management team and consolidating manufacturing facilities.

In addition, we have begun to moderate those selling initiatives in our U.S. generics business which can create high levels of inventory in the distribution channels, and to develop a base of long term customer contracts and arrangements. We believe this will permit us to distribute sales more evenly over the quarter and, accordingly, reduce heavy end-of-quarter selling.

Our fundamental business and its underlying strategies remain intact: the U.S. market for generic drugs doubled over the last three years to more than $6 billion, and industry experts generally expect it to double yet again over the next three to five years. Only a limited number of companies are positioned to meaningfully participate in this rapidly growing market and, among them, IVAX is certainly very well positioned.

Notably, the end of the August 2, 1996 press release contained the following warning in italic print:

*Statements made in this press release, including those relating to expectations of increased reorders, receipt of a credit facility waiver, earnings distribution, and the generic drug industry, are forward*

looking and are made pursuant to the safe harbor provisions of the Securities Reform Act of 1995. Such statements involve risks and uncertainties which may cause results to differ materially from those set forth in those statements. Among other things, additional competition from existing and new competitors will impact reorders; the credit facility waiver is subject to the discretion of the bank syndicate; and IVAX's ability to distribute earnings more evenly over future quarters is subject to industry practices and purchasing decisions by existing and potential customers. In addition, the U.S. generic drug industry is highly price competitive, with pricing determined by many factors, including the number and timing of product introductions. Although the price of generic product generally declines over time as competitors introduce additional versions of the product, the actual degree and timing of price competition is not predictable. In addition to the factors set forth in this release, the economic, competitive, governmental, technological and other factors identified in IVAX's filing with the Securities and Exchange Commission, could affect the forward looking statements contained in this press release.

On September 30, 1996, the last day of the third fiscal quarter, IVAX announced a $13 million restructuring program, which it stated would reduce costs by $20 million a year. In addition to the restructuring, the September 30, 1996 press release stated:

[S]everal factors relating to our U.S. generic drug business will influence our third quarter results. First, our customer inventory levels continue to be high, so customer re-orders remain depressed. Second, prices have continued to decline for generic drug products. Third, lower prices at a time of elevated inventories will increase shelf stock adjustments paid to customers to levels well above more typical quarters. Fourth, we expect reserves for returns and inventory writeoffs to be well above typical quarters as well. Lastly, a wholesaler customer who owed us approximately $16 million filed a Chapter 11 bankruptcy proceeding during the third quarter. Accordingly, in the 1996 third quarter, we supplemented our existing second quarter reserves of approximately $6 million relating to this account with additional reserves of approximately $7 million.

The Defendants represented that IVAX would suffer a total third quarter loss of $43 million. The press release, however, quoted Defendant Frost as stating: "Because certain of the factors affecting the quarter are subject to estimation and cannot be precisely quantified at this time, the actual loss for the quarter ultimately may be greater or less than our forecasted loss by as much as several million dollars." In addition, the September 30, 1998 press release included an italicized warning:

Statements made in this press release, including ... the expected loss for the third quarter ... are forward looking and are made pursuant to the safe harbor provisions of the Securities Litigation Reform Act of 1995. Such statements involve risks and uncertainties which may cause results to differ materially from those set forth in these statements .... In addition to the factors set forth elsewhere in this release, the economic, competitive, governmental, technological and other factors identified in IVAX' filings with the Securities and Exchange Commission could affect the forward looking statements contained in this press release.

At the time of both press releases, IVAX had on file with the SEC its Form 10–K (an annual report) for the most recent year ending December 31, 1995. In that 10–K, IVAX cautioned that when sufficiently adverse changes in business factors indicate that its goodwill may be impaired, writeoffs of goodwill would occur, specifically including the possibility of a writeoff of all of the remaining goodwill at one time. Moreover, IVAX further specifically disclosed that any such writeoffs of goodwill would be charged to operations, thus directly affecting profitability.

On November 11, 1996, IVAX issued a press release with the actual third quarter financial statements. The third quarter results were much worse than forecast: IVAX announced that it would report a loss of $178.7 million for that quarter. IVAX explained in that press release that the losses for the third quarter were caused by several factors, but the majority of the loss ($104.3

million pre-tax charge) was attributed to the writedown of goodwill of its U.S. generic drug distribution business and the writedown of goodwill and assets of certain product lines of its specialty chemicals business. On November 11, 1996, in reaction to the news, the price of IVAX common stock dropped $3.375 in heavy trading volume to a new fifty-two week low of $12.50 per share.

Plaintiffs allege that at the time of the August 2 and September 30, 1996 press releases, the Defendants knew, or should have known, that the goodwill writedowns would be necessary, but failed to disclose that fact in an effort to inflate artificially the value of IVAX stock. As a result of these allegedly materially false and misleading statements and omissions, Plaintiff claim that the Defendants are liable for negligent misrepresentation as well as violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b–5. Defendants contend that the August 2 and September 20, 1996 press releases constitute forward-looking statements immune from liability under the Reform Act's safe harbor.

### Legal Analysis

In December 1995, Congress adopted the Reform Act over the veto of President Clinton. The Act was intended to redress abusive securities litigation in which meritless claims were brought in the hope of using the discovery process to uncover evidence of fraud not alleged in the complaint. Congress heard evidence that the expense of defending such a suits sometimes led defendants to agree to settlements that provided little financial benefit to the claimed victims of the fraud, but fully compensated plaintiffs' lawyers with large fee awards. The Reform Act prohibits certain kinds of securities claims and seeks to insure the disposition of baseless claims before a defendant is forced to engage in expensive, protracted discovery.

Relevant to this case is the Reform Act's safe harbor for forward-looking statements. Congress enacted this safe harbor in reaction to the fear that liability exposure was chilling issuers from providing information about the strength and future of their business:

> Private securities class actions under 10b–5 inhibit free and open communication among management, analysts, and investors. This has caused corporate management to refrain from providing shareholders forward-looking information about companies .... As a result, investors often receive less, not more, information, which makes investing more risky and increases the costs of raising capital.

S.Rep. No. 104–98, at 5 (1995).

Pursuant to 15 U.S.C. § 78u–5(c)(1), a forward-looking statement cannot as a matter of law be the basis of liability under Section 10(b) if either the forward-looking statement is accompanied by meaningful cautionary language, or the plaintiff fails to prove that the person making the statement made it with actual knowledge that the statement was false or misleading.[1] Moreover, any complaint alleging the latter basis of liability must, as to each and every allegedly false or misleading statement, state with particularity the facts giving rise to a strong inference of such actual knowledge.[2]

---

**1.** The precise text of subsection (c)(1) of 15 U.S.C. § 78u–5 reads in relevant part:

[I]n any private action arising under this chapter that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading, a [defendant] shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement -

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity, was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

Subsection (e) specifically instructs a court, on a motion to dismiss based on subsection (c)(1), to "consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement ...." 15 U.S.C. § 78u–5(e).

**2.** 15 U.S.C. § 78u–4(b)(2) reads: "In any private action arising under this chapter in which the plaintiff may recover money damages only on

### 1. Whether Defendants' Alleged Misrepresentations were Forward–Looking

■ Plaintiffs argue that the Reform Act's safe harbor is inapplicable to their claims, as the alleged misrepresentations made by the Defendants were not forward-looking statements, but rather were misrepresentations of present business conditions. For example, Plaintiffs contend that in its press releases and Form 10–K, IVAX failed to disclose the extent to which its goodwill had been impaired, despite representations that it continually evaluates goodwill. Similarly, Plaintiffs object to IVAX's statements that the challenges it had faced were behind it, that the problems that had lead to a weak second quarter had been addressed, and that IVAX's fundamental business strategies remained intact. These representations, Plaintiffs argue, were misstatements of present fact rather than future performance.

Plaintiffs' argument is correct from a grammatical perspective only. While the statement, "We believe that the challenges unique to this period in our history are now behind us," technically reads as a statement of present condition, the meaning of such a statement is clear enough: despite the recent rough period, good times are ahead. Representations regarding the state of a business' position in a changing market or the soundness of its growth strategies are necessarily forward-looking. This is especially true where, as here, the representations are made mid-quarter, before the calculations businesses use to quantitatively evaluate their financial well being are completed. The IVAX press releases were not formal, periodic SEC filings. Until the numbers were crunched at the end of the quarter, the statements in IVAX's press releases that the hard times were over and that the state of the company was strong were nothing more than projections intended to advise the market of anticipated third quarter financial results. These are exactly the kind of forward-looking statements that the Reform Act's safe harbor was intended to shield.[3]

■ The Court is equally unpersuaded by Plaintiffs' argument that IVAX's alleged failure to disclose the impaired value of its goodwill in its press releases was a material omission of a present business condition. Citing Defendants' representations that it continually evaluates its goodwill, Plaintiffs would have the Court view Defendants' goodwill as if it were a line on a graph, on which the precise value of IVAX goodwill can be determined at any given moment in time. Such an analogy bears little relation to reality, where the value of an intangible asset like goodwill is much less exact and depends on numerous other business judgments and financial calculations not made until the end of the quarter. As the cautionary statements at the end of each press release noted, all of the figures regarding IVAX's third quarter loss were projections subject to change. The decision not to factor in the goodwill writeoff in those projections was also necessarily forward-looking; it reflected the judgment of the corporation that goodwill was strong and that no such writeoff would be necessary. Provided that they satisfy one of the two conditions discussed below, such projections are clearly immunized by the Reform Act's safe harbor.

### 2. Meaningful Cautionary Statements

■ Having found that the press releases upon which the Plaintiffs base their claims were forward-looking statements within the meaning of the Reform Act, those statements cannot as a matter of law form the basis of liability under the first prong of the safe harbor if they were accompanied by mean-

---

proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

**3.** *See* 15 U.S.C. § 78u–5(i)(1): The term "forward-looking statement" means—

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) ....

....

(C) a statement of future economic performance, including any such statement contained in a discussion of financial condition by the management ....

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A) ... or (C).

ingful cautionary statements. This provision was based upon the judicially -created safe harbor known as the "bespeaks caution" doctrine. The bespeaks caution doctrine is recognized in this Circuit, *see Saltzberg v. TM Sterling/Austin Assoc.*, 45 F.3d 399, 400 (11th Cir.1995), and provides some guidance in interpreting the Reform Act's safe harbor.

Applying subsection (c)(1)(A)(i), it is clear first that the representations upon which the Plaintiffs attempt to base liability were plainly identified as forward-looking statements. Plaintiffs attempt to avoid that section, however, by arguing that although identified, those statements were not accompanied by meaningful cautionary language. The Court disagrees. While it is clear that "boilerplate warnings will not suffice as meaningful cautionary statements," H.R. Conf. Rep. No. 104–369, at 43 (1995); *see also In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3rd Cir.1993), the italicized warnings at the end of IVAX's press releases go far beyond mere boilerplate. For example, the August 2 and September 30, 1996 press releases warned that the projections contained within them could be materially affected by, among other things, increased competition and the purchasing decisions of existing customers, the volatile nature of the generic drug industry itself and the unpredictability of the degree and timing of price competition, the speed of the restructuring of the production facilities, mistaken estimates and assumptions concerning customer inventory shelf stock adjustments, as well as the other information identified in IVAX's SEC filings.[4] As discussed above, those SEC filings, in turn, warned of the possibility of a goodwill writeoff. When IVAX announced the greater than expected third quarter loss on November 11, 1996, the factors cited as adversely affecting the third quarter results included: depressed customer re-orders, inflated customer inventory and shelf stock adjustments,

continued decline in the price of generic drugs, as well as the large writedown of goodwill. Thus, while Plaintiffs describe IVAX's warning statements as vague and general cautions about the generic drug industry, they turned out to be precisely those factors which led to IVAX's poorer than expected third quarter performance. That IVAX's cautionary statements did not include *all* of the factors that affected the third quarter results is immaterial. The Court will not, looking in hindsight, hold the Defendants to the impossible burden of having to warn of every factor that ultimately causes the forward-looking statement not to come true. Such an approach was not the intent of Congress and would effectively eviscerate the safe harbor.[5] It is sufficient that the cautionary statements identify meaningful and important factors that could affect future performance. Such was clearly the case here. IVAX's cautionary statements "directly address[ed] the substance" of the statements the Plaintiffs challenge and "were tailored precisely to address the uncertainty concerning" the projections contained in the IVAX press releases. *In re Donald J. Trump*, 7 F.3d 357, 371 (3d Cir.1993). Accordingly, the projections contained in IVAX's press releases are immunized from liability.

### 3. Actual Knowledge

█ Even assuming that the press releases contained insufficient cautionary language, dismissal is warranted under the second prong of the safe harbor because it is clear that the Plaintiffs have utterly failed to allege with particularity facts giving rise to a strong inference that the Defendants' representations were made with actual knowledge that the representations were false or misleading. Repeatedly in the complaint, Plaintiffs allege in a totally conclusory fashion that the Defendants "knew or, but for their reck-

---

**4.** Congress was explicit in stating that meaningful cautionary language could incorporate by reference information contained in documents filed with the SEC. *See* H.R. Conf. Rep. No. 104–369, at 45 (1995).

**5.** *See* H.R. Conf. Rep. No. 104–369, at 44 (1995):

The Conference Committee expects that the cautionary statements identify important factors that could cause results to differ materially—but not all factors. Failure to include the *particular factor* that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor.

lessness, should have known" that their representations and omissions were materially false or misleading. Nowhere to be found in the complaint, however, are facts indicating that such was the case. The closest that the Plaintiffs come is their allegation that IVAX's failure to writedown goodwill in a timely fashion was in violation of the Generally Accepted Accounting Principles. And while it may be possible to infer that a corporation would be aware that its accounting practices are violation of GAAP, such an allegation certainly does not give rise to the strong inference of actual knowledge that 15 U.S.C. § 78u–4(b)(2) requires. In short, the Plaintiffs attempt simply to hold up the Defendants' predictions against the backdrop of what actually happened. The Reform Act clearly prohibits such pleading practices. *See In re Silicon Graphics, Inc. Sec. Litig.,* 1996 WL 664639, at *12 (N.D.Cal. Sept.25, 1996).

In their response to the motion to dismiss, the Plaintiffs essentially concede that the complaint alleges few facts regarding the Defendants' mental state. Plaintiffs argue, however, that because 15 U.S.C. § 78u–5(c)(1)(B) requires a plaintiff to *prove* that the forward-looking statement was made with actual knowledge of its falsity, dismissal is inappropriate until the Plaintiffs have had an opportunity to conduct discovery. This argument runs directly counter to the intent of Congress in acting the Reform Act,[6] and ignores the language of 15 U.S.C. § 78u–4(b)(2). That section, as well as the case law, make abundantly clear that dismissal is required where the allegations of the complaint fail to give rise to a strong inference of actual knowledge. *See In re Silicon Graphics,* 1996 WL 664639, at *12; *Fugman v. Aprogenex, Inc.,* 961 F.Supp. 1190 (N.D.Ill.1997).

### Conclusion

In short, this action is exactly the kind of legal claim that Congress sought to foreclose when it enacted the Reform Act's safe harbor. The forward-looking statements upon which the Plaintiffs attempt to base liability were accompanied by meaningful cautionary language intended to put the market on notice that the actual third quarter results could differ substantially from the predictions contained in IVAX's press releases. Even assuming that the warnings contained in the press releases were insufficient, the complaint utterly fails to allege facts giving rise to a strong inference that the Defendants' statements or omissions were made with actual knowledge of their falsity. Accordingly, it is

ADJUDGED that Defendants' Motion to Dismiss, filed July 30, 1997 is GRANTED, and the case is DISMISSED with prejudice.

---

**6.** *See* S.Rep. No. 104–98, at 14 (1995)("The Securities Subcommittee heard testimony that discovery in securities class actions resembles a fishing expedition.... Thus, plaintiffs sometimes file frivolous lawsuits in order to conduct discovery in the hopes of finding a sustainable claim not alleged in the complaint. Accordingly, the Committee has determined that discovery should be permitted in securities class actions only after the court has sustained the legal sufficiency of the complaint."); H.R. Conf. Rep. No. 104–369, at 44 (1995)("The Conference Committee specifies that the cautionary statements identify 'important' factors to provide guidance to issuers and not to provide an opportunity for plaintiff counsel to conduct discovery on what factors were known to the issuer at the time the forward-looking statement was made.")